■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD CULLER, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Deeley, J.), rendered January 2, 1980, convicting him of sodomy in the first degree (four counts), upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. Margett, J. P., Weinstein and Thompson, JJ., concur.

O'Connor, J., dissents and votes to reverse the judgment and grant a new trial, with the following memorandum: Defendant's conviction cannot stand. It is apparent that the jury was not given, as all the parties believed, a case of circumstantial evidence placing defendant at the crime scene, but one transformed into an eyewitness case through the improper admission of rank hearsay identification by the unsworn, speech-impaired seven-year-old victim. Defendant was accused in four counts of the indictment of forcibly committing oral and anal sodomy upon the victim, then six years old, on the roof of a four-story Brooklyn walk-up sometime after 2:00 P.M. on September 25, 1978. At trial the defense restricted itself to the issue of identification; there was no attempt to contest the fact of sodomy, force or age. A joint *Wade-Huntley* hearing was conducted on November 16, 1979 on the defense request to suppress certain evidence the People gave notice of intending to introduce at trial. The motion was denied. Part of the evidence was the testimony of a 13-year-old friend of the victim, who allegedly saw the victim in the defendant's company before and after the attack; the other evidence sought to be suppressed was defendant's explanation for his presence in the apartment building. The role of identification promised in the People's opening statement was similarly limited: The friend was to testify to seeing defendant on a street corner with the victim, watching them walk around the corner to a nearby building, flagging down a police car, and directing the police and the victim's mother to the building. The arresting officer was to testify to their entry into the building, his spotting defendant and then the victim, and then his conversation with the latter. The victim's mother would also testify to what her son had told her directly on her finding him in the building. Finally, the victim himself would testify — as to what had happened on the roof. At trial, however, the evidence which emerged, heavily dependent in theory upon the friend's placing the victim in defendant's custody immediately before and after the

rooftop crime, was riddled with contradictions, although technically sufficient to make out a prima facie case. The friend testified to spotting defendant with the victim for no more than two seconds while he was busy playing ball with the other children on the block. What caught his eye was the fact that the victim had emerged from a store with some cookies and a stranger, and that while the two stood at the street corner the victim refused his little sister's request for a share of the cookies. When the witness turned around again to watch, the victim and the stranger were gone. Without saying how he knew, the witness testified over objection that he then informed police on motor patrol "that this man took Tracy up in the building". He, the police officers and the victim's mother proceeded to the building and went up the stairs, where they found the victim and the man coming downstairs. This man was the same person the witness had seen earlier on the street corner. He noted that the man on the street corner had been wearing sunglasses, which prevented him from fully viewing his face; he did observe the man's nose and lips, although he did not testify to any distinctive facial characteristics. He also testified that the man had worn ordinary blue dungarees and sported a wide, picked-out Afro hair style, which extended about six inches from each side of his head. But on cross-examination, the witness conceded that he had not seen where the victim and the man had gone after disappearing from the street corner; he had obtained that information from the victim's sister. The witness also admitted that he had neither personally observed nor had been told by anyone that the police had at one point taken defendant back up to the roof, although he had so testified on direct. Finally, this young witness also failed to recall at trial his dramatic Grand Jury testimony to the effect that the man had dragged the victim away from a pole he was grasping and up the stairs to the roof. The arresting officer testified that, having been flagged down by a group of children, he and his partner went to the subject building with the victim's mother. On entering he saw defendant descending the first-floor staircase. After stopping him, he spotted the victim standing on the second-floor landing. On inquiring of defendant what he had been doing in the building, the officer was told he had been "upon the roof shooting up." The victim's mother identified the youngster to the officer, and the officer ascended the stairs with her and, while pointing down to defendant who stood next to his fellow officer, asked the victim, "What did that man do to you?" Over objection, the officer testified that at first the boy, who had yet to speak to anyone, failed to answer; after consulting with the mother, the officer asked the boy if "that man" had pulled his pants down. The victim responded affirmatively, and through a series of gestures indicated that he had been sodomized. The officer placed defendant under arrest. The officer testified that defendant appeared to be "possibly" under narcotic influence because he was sweating profusely and was carrying a methadone treatment identification card; the officer also found track marks on both arms, but no drug paraphernalia. The arrest description showed that defendant wore a moustache and beard, but no Afro. No sunglasses were found, and the written report specified that defendant's pants were black — although the word "blue" and a dash appeared as a subscript under the word "black". Although the mother's subsequent testimony indicated that the attack had left the victim in a filthy condition, no other evidence of defendant's physical or sartorial condition was offered. The officer also testified that his partner had recovered two keys belonging to the victim from the roof, although he did not know if there had been any search of the roof for evidence of drug use, nor if there had been any attempt to check for fingerprints on the keys. The victim's mother, contrary to the arresting officer's testimony, stated that when they entered the building she saw her son and defendant standing together on the second-floor landing. She testified, appar-

ently without objection, that before anyone else spoke, her son cried down to her, "Mommy, mommy, that [man] took me on the roof." She also observed that her son was extremely dirty, finding that his underwear and leg had been soiled and that this "mess" included blood. The witness also explained that the boy's communicating with the officer through gestures was an attempt to compensate for the fact that his verbal skill was below normal for a child of his age. Finally, the victim himself testified. Now seven years old, he mostly answered yes or no to the prosecution's leading questions; the defense declined to cross-examine him. He testified to the essential elements of the crimes charged in the indictment, and added that his attacker had given him cookies in the store before taking him by the shoulder to the building and up to its roof, where he was struck at one point. Interrupting the chronological account, the prosecution asked him if he could identify his attacker in the courtroom; he could not. Returning to the chronology, the following inquiry took place: "Q After this was all over on the roof, it's all finished, did you come down from the roof? A (Nodding.) Q By yourself or with somebody? A With that man. Q With that man. And when you were still in the building coming down did you see somebody who you did know? A No. Q. Did you see your mother. A No. Q Did you see the police? A Yeah. Q Where were the police? A Up there. Q Up the stairs? A Only one flight." The record shows that there was no attempt to obtain testimony from the victim that his attacker was the same man whom the police arrested in the building; the connection between "that man" and the man found in the victim's vicinity was simply never made. The next and last witness to testify — the physician who treated the victim's injury and who related the graphic details to the jury — did so after an adjournment from Thanksgiving eve to the following Monday. The defense moved for dismissal on the ground that the case was wholly circumstantial and inadequately so. In opposition, the People argued that their evidence was sufficient, given the testimony of the police officer and the victim's mother concerning the boy's prompt complaint of a sexual assault that included his identifying the defendant. In attacking the probative value of this identification, defense counsel, on summation, specifically pointed out that the victim himself had never testified to any identification of his attacker while in the building; instead, only the police officer and the victim's mother testified to such an identification. The prosecutor did not deny defense counsel's assertion that the victim had failed on the stand to identify as his attacker the man arrested by the police (and later identified as defendant by the arresting officer and his mother); instead, the prosecutor argued that this identification by the victim was established at trial through the testimony of the officer and mother who had observed him make it. Furthermore, the prosecutor argued that the People's basic "connection" among the man on the corner, the attacker on the roof and the man arrested in the building (defendant) was the testimony of the victim's 13-year-old friend. After summation, the court erred in charging the jury without marshaling or referring to the evidence beyond the language of the indictment and without instructing the jury on identification (see *People v Gaines,* 80 AD2d 561; *People v Merriman,* 79 AD2d 619; *People v Vargas,* 74 AD2d 859; *People v Carney,* 73 AD2d 972). Nor did the court specify to which elements of the People's case did its instruction on circumstantial evidence apply. The charge also confused the element of forcible compulsion underlying two counts of the indictment with the element of age underlying the other two counts by interjecting more than once into the discussion of forcible compulsion the comment that forcible compulsion was the equivalent of a lack of consent and that as a matter of law a child under 11 years of age was incapable of consent (see Penal Law, § 130.50, subd 1; cf. *People v Bianchi,* 55 AD2d 993).

No specific objection was made to any of these aspects of the charge. On appeal defendant for the first time characterizes the purported identification of defendant by the victim as rank hearsay, although he raises this point only with respect to the testimony of the victim's mother; he faults the admission of the equivalent testimony by the arresting officer only on the ground that it brought out too many details of the attack under the guise of the timely complaint exception to the rule against accrediting a witness (see *People v Deitsch*, 237 NY 300; *Baccio v People*, 41 NY2d 265, 268-271). The People completely ignore defendant's argument, even though it obviously relates to the testimony of both the mother and the officer. It is apparent that the parties and Trial Judge all believed, in good faith, that the case against defendant was purely circumstantial; however, absent the victim's *own* testimony identifying the arrested man as his attacker, it was unquestionably reversible error to permit the arresting officer to testify over objection that the victim had made such an identification in his presence and then to complete the identification by testifying that the arrested man was defendant (see *People v Nival*, 33 NY2d 391, app dsmd and cert den 417 US 903; *Matter of Pablo F.*, 98 Misc 2d 919; *People ex rel. Guggenheim v Mucci*, 77 Misc 2d 41, 43). It cannot be denied that, given the numerous contradictions undermining the witnesses' credibility, there was here "a reasonable danger that the jury [took] the officer's testimony, that the eyewitness victim identified the perpetrator, as a substitute for identification by the eyewitness victim" (see *People v Burgess*, 66 AD2d 667, 668). The conviction should be reversed as a matter of law because defense counsel had made a timely objection; it was correctly overruled only to the extent that the witness informed the jury of a timely complaint of a sexual assault, but incorrectly overruled to the extent that the witness made an identification. Although on appeal defendant concedes a failure to object to the equivalent hearsay identification testimony by the victim's mother, the obvious prejudice of this egregious error requires by itself a reversal in the interest of justice; certainly, it would require reversal in view of the court's defective charge to the jury. I therefore vote to reverse and remit for a new trial.